UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel* Carla Martin<br><br>    Relator,<br><br> v.<br><br>Lincare Holdings, Inc. d/b/a Lincare, Inc.; Lincare, Inc. d/b/a United Medical; and Does 1-10<br><br>    Defendants. | CASE NO. 98-2120<br><br>JURY DEMANDED |

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE FALSE CLAIMS ACT, TENNESSEE PUBLIC PROTECTION ACT, AND TENNESSEE COMMON LAW FOR WHISTLEBLOWER RETALIATION

**Jurisdiction and Venue**

1. This is an action to recover damages for a whistleblower with a newborn child who was fired after she began investigating her employer's Medicare fraud. The action arises under the provisions of 31 U.S.C. § 3730(h) et. seq. and 10 U.S.C. §1071 et. seq. and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304, and the Tennessee common law of whistleblower retaliation.

2. Section 3729(a) of the False Claims Act provides that "Any action under section 3730 may be brought in any judicial district in which any Defendant may be found to reside, or transact business, or in any district in which any proscribed act has occurred. Some of the acts complained of herein occurred within this judicial district.

1

3. The Complaint was originally filed on behalf of the United States as well as on behalf of the Relator. The parties reached a settlement whereby Lincare Holding, Inc. and Lincare, Inc. paid $300,000 to the United States and entered into a Corporate Integrity Agreement with the United States Department of Health and Human Services. Relator is proceeding on her own now for the damages she personally suffered as a result of the retaliation.

### Parties to the Action

4. Relator is a citizen and resident of the State of Tennessee and originally brought this action on behalf of the United States of America. Hereafter she shall be referred to as Relator.

5. As required under the Act, Relator furnished to the Attorney General of the United States and to the United States Attorney for the Western District of Tennessee, simultaneous with or prior to the filing of this Complaint, a statement of all material evidence and information related to the Complaint. This disclosure statement supported the existence of overcharges and false claims by the Defendants.

6. Relator holds a Bachelor's degree in marketing and merchandising. She was employed by Defendants from the middle of 1995 until the end of 1997. She discovered that Defendants were engaging in false and fraudulent conduct. When she protested this, she was put on probation and subjected to harassment. She was fired from her job for continuing her investigation into this conduct.

7. Defendant Lincare Holdings, Inc. is a nationwide health care provider, specializing in long term care and is a foreign corporation doing business in Shelby County, Tennessee, as Lincare, Inc., with its principle office located in Clearwater, Florida.

8. Defendant-Company Lincare, Inc., is a foreign corporation doing business in Shelby

County, Tennessee, as United Medical (assumed name) with its principle office located in Clearwater, Florida.

9. At all times complained of herein, Plaintiff was an employee of the Defendant-Companies Lincare Holdings, Inc. and Lincare, Inc. (hereinafter "Lincare").

10. The Defendant-Companies operated as an integrated and/or joint employer under Tennessee law.

11. Lincare submitted false claims to Medicare.

12. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 10, inclusive, and each of them, are unknown to Relator who, therefore, sues these Defendants by such fictitious names and will ask leave of court to amend this Complaint when the same shall have been ascertained. Relator is informed and believes and upon such information and belief alleges that each Defendant designated herein as a Doe is responsible for the events and happenings referred to herein which caused the submission of false claims to the United States of America.

13. At all times herein mentioned, each of the Defendants, was an agent, servant or employee of each of the remaining Defendants, and was at all times acting within the purpose or scope of said agency or employment, and was acting with the express or implied knowledge, permission or consent of the remaining Defendants, and each of them.

## THE MEDICARE PROGRAM

14. In 1965 Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain hospital services and care.

15. The Department of and Human Services is an agency of the United States and is

responsible for the funding, administration and supervision of the Medicare Program. The Health Care Financing Administration (HCFA") is a division of that agency of the United States and is directly responsible for the administration of the Medicare Program. HCFA, in discharging those responsibilities, contracted with private insurance companies, known as intermediaries, to receive, review, and pay appropriate claims for reimbursement for the provision of home services to Medicare Program beneficiaries.

16. Eligible persons age 65 years and over may enroll in Medicare Part B to obtain health insurance benefits in return for payment of monthly premiums in an amount established by HCFA. Such individuals are known as "beneficiaries" under the program.

17. Part B of the Medicare Act was pay for home services for Medicare beneficiaries who were homebound and were in need of nursing and rehabilitative services, including durable medical equipment such as oxygen dispensers and ventilators.

18. When a beneficiary obtains medical services from a Part B provider the beneficiary may either pay for the service him or her self, and submit the provider's bills to Medicare for reimbursement ("unassigned claims") or the beneficiary may assign the right to reimbursement to his or her provider, in which case the provider then submits a bill to Medicare and receives the Medicare reimbursement as the beneficiary's assignee ("assigned claims").

19. Only providers who are "participants" may submit assigned claims for payment.

20. In order to become a Medicare Part B participant provider physicians and others must agree to certain conditions of participation, including, *inter alia*, the following program requirements:

    A. not to make false statements or misrepresentations of material facts

concerning requests for reimbursement, 42 U.S.C. §§ 1320a-7b(a)(1)(2), 1320a-7, 1320a-7a; 42 C.F.R. § 1001.101(a)(1);

    B.    to bill Medicare only for reasonable and necessary services, 42 U.S.C. §1395y(a)(1)(A);

    C.    to provide economical medical services, and then, only when medically necessary, 42 U.S.C. §13320c-5(a)(1);

    D.    to assure that such services are not substantially in excess of the needs of such patients, 42 U.S.C. §13320a-7(b)(6)(B);

    E.    to certify that the service claimed is a medical necessity. 42 U.S.C. §1395n(a)(2)(B).

21.    42 U.S.C. §1395nn(b) prohibits referrals to any entity furnishing durable medical equipment with which the physician has a financial relationship, compensation agreement, or from whom the physician receives any form of remuneration, including the receipt of items, devices, or supplies.

### Lincare's Fake Oxygen Testing Scheme

22.    Defendants committed Medicare fraud through the following diagnostic testing scheme that Ms. Martin uncovered:

    A.    Lincare itself performed and analyzed diagnostic testing known as overnight oxygen saturation testing on patients for the purpose of procuring physicians' signatures to certificates of medical necessity. Lincare concealed from Medicare the fact that it, not the physician, had performed the testing. Lincare's Area Manager, Sam Owem, ordered employee's to keep Lincare's names off of the test reports. Owens also told employees that

the software was set up to keep the name of "Profox" the software Lincare used to manipulate the reporting, off the reports themselves.

  B. Lincare artificially manipulated the test conditions in such a way as to cause patients to show on the tests that they had a lower level of oxygen in their blood than they actually did. This was done by subjecting the patients to exercise shortly before the testing.

  C. Ms. Martin was told by her supervisor, after he had a conversation with Area Manager Sam Owen, that this overnight testing scheme crossed the line of what Medicare did not permit.

  D. Although Lincare's sales representatives were not clinically trained, Lincare had them perform overnight oximetry testing on sick patients at their homes. These untrained salespeople and women were telling patients how to use diagnostic testing devices. The sales representatives would pick up the diagnostic devices the morning after these "tests", download the data on Lincare's office computer in the office and taking the printouts directly to the patients' physicians.

  E. Where the patients were too healthy to need an oxygen device that Lincare wanted Medicare to pay for, at least three of Lincare's employees would subject the patients to exercise, making them walk back and forth until the patients' oxygen levels would test low enough to qualify for Medicare payments.

**Lincare Bribed Doctors to Prescribe Oxygen and Expensive Machines**

23. Defendants committed Medicare fraud through the following kickback scheme that Ms. Martin uncovered:

  A. Lincare gave kickbacks to doctors who ordered Lincare equipment and

services. Ms. Martin was told by her supervisors that she was to give doctors testing equipment worth as much as $600 if they wanted it. Under orders, Ms. Martin herself gave out thousands of dollars worth of such equipment to Memphis area physicians.

    B.    Lincare encouraged physicians who referred patients to Lincare to submit claims to Medicare for tests they neither administered nor interpreted by concealing the fact that Lincare itself had performed the tests, and that the computer-generated and interpreted graphs were neither produced nor analyzed by the physicians involved.

    C.    One physician who referred numerous patient overnight oxygen tests for thousands of dollars a year from the company to "interpret" the computer-generated studies.

    D.    Lincare would waive Medicare's 20% patient copay requirements for some goods and services without regard for the patient's actual ability to pay, as an incentive to have Lincare's goods and services used.

### Lincare Billed Medicare for Expensive BIPAP Machines Patients by Lying to Doctors About All the Training and Support the Patients Would Get

24.    Defendants committed Medicare fraud through the following fraudulent BIPAP scheme that Ms. Martin uncovered:

    A.    Lincare would furnish patients CPAP (Continuous Positive Airway Pressure) machines. If the patients' test results, however procured, were low enough, Medicare would pay for the rental of these machines.

    B.    In 1996 or 1997, the Government, alarmed at the skyrocketing costs for in home oxygen services, reduced what Medicare would pay for home oxygen. To make up for the profits Lincare would lose because of these reforms, Lincare decided to push the sales or rental of much more expensive BIPAP (Biphasic or Bilevel Positive Airway Pressure)

machines.

    C.    Sam Owen was Lincare's Area Manager for a region reaching from Little Rock to Tupelo. In 1997 Owen ordered his sales that they would sell BIPAP machines whether they liked it or not, and that "heads would roll" if they failed to do so.

    D.    In October or November of 1997, Ms. Martin and the other sales representatives were warned away from marketing these "improved" devices to pulmonologists who, with their superior knowledge of breathing problems, knew that the machines were rarely if ever any real improvement over the less expensive CPAP machines. Lincare told Ms. Martin and its other sales representatives that Lincare would make $840 per month for each machine it rented..

    E.    As a marketing tool to justify these expensive machines, Lincare claimed to have a "nocturnal ventilatory support" program, called NVS. Under this program, Lincare promised physicians that a trained, licensed, respiratory therapist would devote forty hours to each BIPAP patient to train them in the proper use of this equipment. There was no way the bare handful of respiratory therapists could provide that kind of training or attention to the many patients Lincare put on the BIPAP devices. What actually happened instead was that a Lincare respiratory therapist would go to the patient's house one time to show the patient how to operate the machine. The claim of forty hours and training and support was a hoax.

    F.    Lincare would not check to see if the patients were using the machine, or if it was being used properly. Unless the patient called Lincare and told them to pick it up, the machine would remain there, with Lincare charging Medicare rent, until the patient died.

G. After Ms. Martin photocopied numerous documents to give to Medicare, Lincare had its respiratory therapists make false entries in patient charts, so Lincare could claim that it actually gave patients the promised forty hours of support.

H. Lincare submitted claims for bipap equipment in deliberate disregard of knowledge that the equipment was not medically necessary. Even though fully thirty percent (30%) of the BIPAP patients called Lincare and told them they were not using these machines, Lincare pressed ahead with the program.

**Lincare Fired Carla Martin for Investigating and Opposing These Fraudulent Schemes**

25. Carla Martin went to work for Lincare in 1995. She received a salary increase and positive performance reviews for her work.

26. At a November, 1997 meeting of the sales staff to discuss Lincare's sales quotas for each representative, Ms. Martin questioned the quotas, asking if sales were more important than following the patient criteria and only recommending BIPAP machines for patients who meet the criteria.

27. In December of 1997, Ms. Martin began photocopying Lincare records. After she was caught, her immediate supervisor, Harry Ireland, was ordered to fire her, even though Lincare knew that Ms. Martin had only recently adopted a newborn infant, and was a single mother.

28. Mr. Ireland himself quit just weeks after being forced to fire Carla Martin. In his exit interview he openly referred to Sam Owen's pressure on the sales staff to commit Medicare fraud, and to the firing of employees who resisted or questioned this fraud.

**FIRST CAUSE OF ACTION FOR RETALIATION IN VIOLATION OF 31 U.S. §3730(h)**

29. Relator repeats and repleads and thereby incorporates each of the allegations in Paragraphs 1 through 28 as though fully set forth herein.

30. Relator was harassed, retaliated, discriminated against, and fired from her job in retaliation for her efforts to investigate the false claims described hereinabove. These acts were carried out in violation of 31 U.S.C. §3730(h).

31. As a direct result of the foregoing wrongful acts, Ms. Martin suffered loss of wages and loss of future income. She was also forced deep into debt.

32. As a direct result of the unlawful retaliatory discharge by Defendants, Ms. Martin, who had only months before adopted a newborn baby, suffered and will continue to suffer not only a significant loss of pay and benefits, but also emotional pain and suffering, inconvenience, humiliation and embarrassment, loss of enjoyment of life and injury to professional and credit standing for which she is entitled to recover actual and compensatory damages.

**SECOND CAUSE OF ACTION FOR RETALIATION
IN VIOLATION OF PUBLIC POLICY**

33. Relator repeats and repleads and thereby incorporates each of the allegations in Paragraphs 1 through 32 as though fully set forth herein.

34. Relator was fired from her job in retaliation for her refusal to remain silent about, or participate in, Lincare's actions, which she had reasonable cause to believe were illegal. Such a firing is in violation of T.C.A. 50-1-304 and the Tennessee common law of whistleblower retaliation.

35. As a direct result of the foregoing wrongful acts, Ms. Martin suffered loss of wages and loss of future income. She was also forced deep into debt.

36. As a direct result of the unlawful retaliatory discharge by Defendants, Ms. Martin, who had only months before adopted a newborn baby, suffered and will continue to suffer not only a significant loss of pay and benefits, but also emotional pain and suffering, inconvenience, humiliation and embarrassment, loss of enjoyment of life and injury to professional and credit standing for which she is entitled to recover actual and compensatory damages.

37. This conduct was malicious and in conscious and deliberate violation of Ms. Martin's rights. Relator is therefore entitled to punitive damages from the Defendants because the retaliation against her constitutes willful misconduct done so recklessly as to imply such a disregard of social obligation or an entire want of care to raise a presumption of conscious indifference to the consequences and in reckless disregard of the Defendants' social obligations and/or was committed with malice and bad motive. Plaintiff also avers that she is also entitled to punitive damages in order to deter the Defendants from further violations of Tennessee's statute and common law prohibiting the retaliatory discharge of employees and to deter other companies from engaging in similar unlawful conduct.

## PRAYER FOR RELIEF

### For the First Cause of Action

1. General damages;

2. Two times the amount of back pay;

3. Interest upon said back pay;

4. Medical and other special damages;

5. Litigation expenses and reasonable attorney's fees; and

6. An order reinstating Ms. Martin with full seniority that she would have had but for the discrimination or retaliation, or awarding her front pay and benefits.

### For the Second Cause of Action

7. An order reinstating Ms. Martin with full seniority that she would have had but for the discrimination or retaliation, or awarding her front pay and benefits.

8. General damages;

9. Back pay and benefits;

10. Interest upon said back pay;

11. Medical and other special and/or compensatory damages;

12. Litigation expenses and reasonable attorney's fees; and

13. Punitive damages in an amount sufficient to punish Defendant and to deter future similar misconduct.

### For All Causes of Action

14. For such other and further relief as the Court deems just and proper.

Relator hereby demands a jury trial.

DATED:   May 25, 2007

Respectfully Submitted,

**NORWOOD, HOWARD & ATCHLEY**

By: s/ Dan M. Norwood
Dan M. Norwood (#005926)

By: s/ David B. Stevenson
David B. Stevenson (#024732)

        1407 Union Avenue, Suite 807
        Memphis, Tennessee 38104
        Telephone - 901-276-7676
        Facsimile   - 901-276-7212
        davidstevenson@nhalaw.com
        dannorwood@nhalaw.com

        **LAW OFFICES OF MARK KLEIMAN**

        By: s/ Mark Allen Kleiman
        1640 Fifth Street, Suite 214
        Santa Monica, CA 90401
        Telephone: 310-260-2303
        Facsimile: 310-260-2535
        markkleiman@earthlink.net

        Attorneys for Relator

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served upon the following, via the Court s Electronic Case Filing System, on this the 25th day of May 2007 on the following:

Glen Reid, Jr. BPR #8184
Kim Koratsky BPR #20163
WYATT, TARRANT & COMBS, LLP
1715 Aaron Brenner Drive
Suite 800
Memphis, TN 38120
901/537-1000
Counsel for Defendants

        By: s/ David B. Stevenson
        David B. Stevenson